J-S24045-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY L. LACASTRO, JR. | : | |
| | : | |
| Appellant | : | No. 227 WDA 2021 |

Appeal from the PCRA Order Entered October 21, 2020
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0000746-2018

BEFORE:   DUBOW, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED: AUGUST 31, 2021**

Appellant, Anthony L. LaCastro, Jr., appeals from the October 21, 2020, order entered in the Court of Common Pleas of Erie County, which dismissed Appellant's first petition filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546, without an evidentiary hearing.  After a careful review, we affirm.

The relevant facts and procedural history are as follows: After police responded to Appellant's home in connection with the report of a domestic dispute, Appellant fired shots at police officers.  Appellant was arrested, and represented by counsel, he proceeded to a jury trial.  This Court previously summarized the evidence presented at Appellant's jury trial as follows:

_____

[*] Former Justice specially assigned to the Superior Court.

Appellant and his wife, Ruth Ann LaCastro ("Wife"), attended church and a party on the evening of January 6, 2018. N.T., (Jury Trial Day 3), 1/16/19, at 91. Appellant, who wears a holster with a licensed handgun "all the time," was drinking, and Wife was not. *Id.* at 91-92, 100. Wife testified that Appellant "gets belligerent and stubborn" when he drinks, and "you can't talk to him." *Id.* at 93. While at the party, Appellant fell[,] hit his head[,] and was bleeding. *Id.* at 94. As they left, Appellant and Wife argued about going to the hospital and who would drive; Appellant refused to allow Wife to drive. *Id.* On the way home, it was "very slippery," and Appellant "was weaving on the street." *Id.*

Once home, Wife went upstairs, and Appellant stayed downstairs. When Wife went to check on him, Appellant was "passed out on his desk" in the garage. [*Id.*] at 95, 98. Wife shook him, and he "said he was fine." *Id.* at 98. Wife went back upstairs but returned to the garage a few minutes later to check on Appellant again. *Id.* at 99. As Wife entered the garage, Appellant twice fired his handgun that had been in the holster on his belt "randomly," not in Wife's direction. *Id.* at 101. Wife stated Appellant passed out again but awoke as Wife pried the gun from Appellant's hand. *Id.* Wife left the garage and hid the gun in a clothes hamper in the house. Wife called 911. *Id.* at 102.

Wife stated that she called 911 to get an ambulance for Appellant. [*Id.*] Appellant was angry because he did not want to go to the hospital, and he told Wife, "[I'm] going to shoot anybody that comes down that driveway, because this is my house and my property." *Id.* at 104. Wife also stated Appellant said, "I hate everybody. I'm shooting everybody." *Id.* at 106. Wife testified she returned downstairs to find that Appellant "got the rifle out of the gun safe." *Id.* at 108. He was "getting the gun ready," and "[p]utting bullets in it, and stuff like that." *Id.* at 110. Wife characterized Appellant as "very upset and agitated." *Id.* at 111. Wife explained that she then told Appellant she would call back and cancel the ambulance. Appellant replied, "[I]t's too late. And he walked out the door outside." *Id.* at 103. Wife initially went outside as well. Wife testified, "I went outside because I just wanted to watch him, check on him, and see what he was going to do. And I assumed that when I went back into the house he would follow me back into the house--…but he didn't." *Id.* at 123.

Testimony at trial confirmed that Wife first called 911 on January 7, 2018, at approximately 1:00 a.m., and the call center

- 2 -

referred the call to Pennsylvania State Police Communications Officer ("PCO") Richard Schau. N.T., (Jury Trial Day 2), 1/15/19, at 11-12. PCO Schau explained that the 911 call center refers calls for the state police to the barracks in Erie, Pennsylvania, where he works. Based upon that call, as well as follow-up calls, which were played at trial and for which the jurors were given transcripts [that were marked as exhibits at trial], the dispatch center broadcast that there was a domestic dispute at Appellant's home. In the 1:09 a.m. call, Wife indicated Appellant was "passed out on the garage floor," and she "got the pistol away from him…." *Id.* at 17. During the 1:14 a.m. call, Wife indicated Appellant "had regained consciousness…and he had obtained another firearm." *Id.* at 14. At approximately 1:19 a.m., a neighbor called 911 stating that he or she "heard six gunshots at that time." *Id.* at 18. Wife, as well, reported hearing those gunshots. *Id.* at 19. All of this information was relayed to police responding to the incident. *Id.* at 11, 13, 14, 18.

PCO Schau was on the telephone with Wife again at 1:23 a.m. when he heard five gunshots fired at 1:24 a.m. The recording of the call played at trial confirmed the number of shots. [*Id.*] at 21-23. The Computer Aided Dispatch ("CAD") report generated by the state police indicated that the state troopers returned fire twenty seconds later at approximately 1:25 a.m. *Id.* at 23. The 911 recordings also confirmed Wife's statement to PCO Schau that Appellant said he was going to shoot at police. *Id.* at 25.

Pennsylvania State Trooper Kyle J. Callahan testified he was working overnight on January 6-7, 2018, with his partner, Trooper (now Corporal) Cody J. Williams, when they were dispatched to Appellant's home for a domestic dispute. [*Id.*] at 28-29. Trooper Callahan carried a "Bushmaster AR-15," and Trooper Williams carried a "department-issued SIG-SAUER handgun." *Id.* at 38. Corporal Dan Moore, the patrol shift supervisor that evening, and Troopers Jake Goga and Kevin Geibel also were dispatched to Appellant's home. *Id.* at 31. While en route, the officers received information that Appellant "had pulled out a firearm and shot two rounds in the garage area." *Id.* at 29. They then were advised that Appellant "had passed out and the gun was taken away from his person and hidden somewhere in the residence." *Id.* at 30. The next radio dispatch stated that Appellant was outside dressed in a red sweatshirt and black pants, possessed a "high powered military-style rifle," knew police were en route, and "he was going to shoot at police upon…arrival." *Id.* at 30-31. The officers also

knew that a neighbor had called and "could hear shots being fired" before police arrived. *Id.* at 32.

As the five troopers approached Appellant's house, they saw him facing the pedestrian door of the garage with his "rifle on his shoulder,…yelling into the house, you could tell he sounded angry." [*Id.*] at 39. Trooper Callahan yelled, "[S]tate trooper, put the gun down, let me see your hands" multiple times. *Id.* Trooper Callahan testified that Appellant "instantly turned toward me and squared up with me." *Id.* at 40. The officer stated, "[I]n those split seconds which I call a slowdown in my life, [Appellant] instantly brought the gun up, swept over, and he said, f--- you, mother---, and multiple rounds came down the range towards us." *Id.* at 43. Trooper Callahan stated, "I took my first shot as soon as I saw the barrel of the gun come up." *Id.* He continued, "I stood up from my crouched position, took a deep breath, and I took my second shot as I was looking through my scope[,] and I observed [Appellant] fall to the ground once I took my second shot." *Id.*

Trooper Williams testified similarly. He heard the shots Appellant fired at police. [*Id.*] at 90-91. When Appellant squared his body "as if taking a shooting stance" and brought his gun up, Trooper Williams "got into a tactical maneuver down on one knee[,] and…fired [his] first round." *Id.* at 89. He confirmed that he had "a SIG pistol…which is a .45 Caliber." *Id.* Trooper Williams stated that he fired twice. *Id.*

Trooper Goga, who had an "AR-15 rifle, department issued," and Trooper Geibel, who had a "12-gauge shotgun," heard gunfire coming in their direction. [*Id.*] at 115, 130, 142. Trooper Goga remarked, "Kevin, we're getting shot at, we're taking fire at this time." *Id.* at 115. The troopers exited their vehicle. Trooper Geibel yelled, "[D]rop you weapon or drop the gun," and Trooper Goga observed Appellant yell, "F--- you, mother ---, and he lifted the rifle up in his right hand, his left hand came around, and the gunfire was exchanged between the troopers and [Appellant]." *Id.* at 118, 142. Trooper Goga fired his weapon from the road three times. *Id.* at 123, 135. Trooper Geibel could not see Appellant, but heard the gunfire coming toward police. *Id.* at 142. All officers testified that gunfire coming toward a person sounds differently "than your typical gunfire," like a "snap whenever it's coming towards you." *Id.* at 90-91, 103, 142, 163, 173-74. Corporal Moore, who had a "SIG 45 ACP, department issued weapon," testified hearing "snaps like we were being shot at." *Id.* at 163. He stated:

- 4 -

In my experience in both law enforcement and in my life I grew up around guns and everything, a weapon makes a very distinct sound when the muzzle is pointed in your direction, it's very different than being behind the weapon when it fires. It's basically the sound of the projectile going past, you hear it. It's a very distinct sound, not something you forget.

*Id.* at 164. Appellant was shot in the abdomen, and [he] was taken to the hospital by ambulance. *Id.* at 96.

Corporal Victoria Weibel processed the crime scene to collect the evidence as well as photograph the crime scene at approximately 3:40 a.m. [*Id.*] at 179, 184. Corporal Weibel outlined her practice for capturing photographs and collecting evidence. *Id.* at 185-191. Corporal Weibel testified she located two .45 caliber spent shell casings consistent with Trooper Williams's location, and two shell casings consistent with Trooper Callahan's location. *Id.* at 192. Corporal Weibel further described the locations of spent casings in front of the pedestrian door of the garage. *Id.* at 195.

Pennsylvania State Police Corporal Dale Wimer testified as an expert firearm and toolmaker examiner. N.T., (Jury Trial Day 3), 1/16/19, at 34. He "examine[s] bullets, cartridge cases, and shot shell[s] to determine if they may have been discharged from or within the questioned firearm." *Id.* Corporal Wimer "can provide investigators with a list of possible firearms that a discharged bullet was discharged from." *Id.* Instantly, Corporal Wimer testified which discharged rounds corresponded with which firearms. He evaluated the shell casings and determined that eight casings at the north end of the driveway in front of the pedestrian door were from Appellant's rifle. A ninth casing was inconclusive but was excluded from being fired from any of the other rifles on the scene. *Id.* at 47.

Corporal Wimer further testified that the two spent .45 caliber shell casings were discharged from the Sig-Sauer, possessed only by Trooper Williams on the scene. [*Id.*] at 52. Corporal Wimer determined that the three discharged casings found near Trooper Goga were from his rifle. *Id.* at 53-54. Corporal Wimer concluded that it was inconclusive whether the shell casings found at Trooper Callahan's location were fired from Trooper Callahan's rifle, but Corporal Wimer excluded all of the other rifles on scene. *Id.* at 55-56.

Appellant was tried and convicted of [five counts each of attempted first degree murder, aggravated assault, serious bodily injury, recklessly endanger another person ("REAP"), and one count of possession of an instrument of crime ("PIC")] on January 18, 2019. He was sentenced on April 3, 2019, to an aggregate term of imprisonment of 103 to 288 months. Appellant filed a timely notice of appeal.

*Commonwealth v. LaCastro*, No. 688 WDA 2019, at 1-8 (Pa.Super. filed 11/14/19) (unpublished memorandum) (footnote omitted).

On appeal, Appellant contended the evidence was insufficient to sustain his convictions for attempted first degree murder. Specifically, he asserted that he could not have been convicted of five different counts of attempted murder for five different Pennsylvania State Troopers since he fired only two shots. *Id.* at 10. In this regard, he maintained there were only two discharged .223 caliber shell casings from his AR-15 rifle, and the state troopers' testimony established that two shots were fired by Appellant. *Id.*

This Court found no merit to Appellant's sufficiency of the evidence claim.[1] In this regard, we relevantly noted that Appellant's argument "discounts the seven bullet holes in the garage and the seven discharged .223 caliber shell casings located 'at tent markers eight[] through fourteen[]' that

_____

[1] We note the Commonwealth asserted on appeal that it did not need to prove a numerical correlation between the number of shots fired and the number of victims in order for this Court to sustain Appellant's convictions. However, inasmuch as this Court found ample evidence that Appellant fired at least five bullets at the five officers, this Court did not directly address the Commonwealth's contention.

were located on the south side of the garage." ***Id.*** (citation to record omitted).

We further reasoned:

> Corporal Weibel's testimony regarding her collection of evidence at the crime scene discounts Appellant's claim of insufficient evidence. Corporal Weibel testified that she placed "evidence tents," which are "numbered plastic markers that have some portions of scale…to show some evidence or depictions of how various things are sized." Corporal Weibel recovered Appellant's AR-15 rifle inside the garage, which is where troopers had placed it after removing it from Appellant's hand. Appellant's rifle had two magazines held in place by a coupler, which functions as follows: "[i]t just holds the two magazines in place so once you have fired through whatever ammunition is in one, you can actually just eject it and move it and re-insert immediately with a fresh magazine, fresh ammunition." She testified that one of the magazines "was empty, the other still had live, undischarged rounds."….Also, as noted *supra*, Corporal Wimer testified that eight of the nine discharged cartridge cases were from Appellant's rifle, and a nineth was inconclusive from that rifle, but was not discharged from any other semiautomatic rifle at the scene.
>
> Appellant's shots toward police under the facts of this case prove a substantial step toward the killing of police. There were eight spent rounds from Appellant's rifle as he stood in his driveway. All of the officers at the scene testified to hearing the distinctive snap of bullets fired **toward** them. Photographs admitted at trial substantiated the troopers' testimony regarding shots fired at them.

***Id.*** at 12-13 (citations to record omitted) (bold in original).

Accordingly, this Court rejected Appellant's sufficiency of the evidence claim and affirmed Appellant's judgment of sentence on November 14, 2019. Appellant did not file a petition for allowance of appeal with our Supreme Court.

On August 13, 2020, Appellant filed a timely, counseled PCRA petition, and on September 9, 2020, the PCRA court provided Appellant with notice of

its intent to dismiss the petition without an evidentiary hearing. On October 21, 2020, the PCRA court dismissed Appellant's PCRA petition.

Appellant did not file a timely notice of appeal; however, on January 19, 2021, he filed a counseled petition seeking the reinstatement of his appeal rights *nunc pro tunc*.[2] On February 2, 2021, the PCRA court granted the petition to reinstate Appellant's PCRA appeal rights, and on February 17, 2021, Appellant filed a counseled notice of appeal. All Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant contends (1) trial counsel was ineffective in failing to object to the admission of the crime scene photographs; (2) trial counsel was ineffective in failing to hire an expert in firearms to testify at trial on behalf of Appellant; (3) the cumulative impact of the multiple instances of counsel deprived Appellant of his due process rights; and (4) the PCRA court erred in dismissing Appellant's PCRA petition without an evidentiary hearing.[3] *See* Appellant's Brief at ii-iii, 7-8.

_____

[2] Therein, counsel averred Appellant timely requested that he file a notice of appeal from the PCRA court's dismissal order; however, due to various COVID-19 restrictions, including counsel's inability to work in his office and coordinate with his staff members, the notice of appeal was not timely filed. Counsel averred that, after the "mishap came to light," he filed the petition to reinstate Appellant's appeal rights the next day.

[3] We have rephrased and renumbered Appellant's issues for the ease of discussion.

- 8 -

Initially, we note "[o]ur standard of review of the denial of PCRA relief is clear; we are limited to determining whether the PCRA court's findings are supported by the record and without legal error." ***Commonwealth v. Wojtaszek***, 951 A.2d 1169, 1170 (Pa.Super. 2008) (quotation marks and quotation omitted). "We must accord great deference to the findings of the PCRA court, and such findings will not be disturbed unless they have no support in the record." ***Commonwealth v. Scassera***, 965 A.2d 247, 249 (Pa.Super. 2009) (citation omitted).

Further, inasmuch as Appellant's claims present allegations of ineffective assistance of trial counsel, we apply the following well-established legal principles:

> In order to be eligible for PCRA relief, the petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found in Section 9543(a)(2), which includes the ineffective assistance of counsel. 42 Pa.C.S.[A.] § 9543(a)(2)(i).
>
> It is well-established that counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him. To prevail on an ineffectiveness claim, the petitioner has the burden to prove that (1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance. The failure to satisfy any one of the prongs will cause the entire claim to fail.

***Commonwealth v. Benner***, 147 A.3d 915, 919–20 (Pa.Super. 2016) (quotation marks, quotations, and citations omitted).

We need not analyze the prongs of an ineffectiveness claim in any particular order. Rather, we may discuss first any prong that an appellant cannot satisfy under the prevailing law and the applicable facts and circumstances of the case. [C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.

*Commonwealth v. Johnson*, 635 Pa. 665, 139 A.3d 1257, 1272 (2016) (citations omitted). *See Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409, 419 (2009) ("A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.") (citation omitted)). "A claim has arguable merit where the factual averments, if accurate, could establish cause for relief." *Commonwealth v. Stewart*, 84 A.3d 701, 707 (Pa.Super. 2013) (*en banc*) (citation omitted).

Further,

To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.

*Commonwealth v. Spotz*, 624 Pa. 4, 84 A.3d 294, 311-12 (2014) (citations, quotation marks, and quotations omitted).

In his first issue, Appellant contends trial counsel was ineffective in failing to object to the admission of the crime scene photographs, which depicted seven discharged shell casings with "snow tails,"[4] since the crime

_____

[4] "Snow tails" are "trails made in the snow after the casings hit the ground[.]" *See LaCastro*, 688 WDA 2019, at 11 (citation omitted).

- 10 -

scene photographs were not provided to Appellant during discovery. Specifically, Appellant asserts:

> Counsel first failed to object to the admission of crime scene photographs at trial since they were not provided in discovery to [Appellant], and therefore, would have been excluded pursuant to Pa.R.Crim.P. 573(E). Specifically, the photographs of the discharged shell casings with snow tails was [*sic*] offered into evidence in support of the Commonwealth's assertion that [Appellant] was facing south and in the direction of the [t]roopers when he discharged his weapon multiple times in an attempt to kill them. The remedies for a violation of discovery are set forth in Pa.R.Crim.P. 573(E) [and] include prohibiting such party from introducing evidence not disclosed[,] which should have occurred here.

Appellant's Brief at 29-30 (citations to record omitted).

Pretrial discovery in criminal cases is governed by Pa.R.Crim.P. 573. The rule lists certain items and information that are subject to mandatory disclosure by the Commonwealth when they are (1) requested by the defendant, (2) material to the case, and (3) within the possession or control of the prosecutor. Pa.R.Crim.P. 573(B). Mandatory discovery includes any evidence favorable to the accused that is material to either guilt or punishment. Pa.R.Crim.P. 573(B)(1)(a). "The law is clear that a criminal defendant is entitled to know about any information that may affect the reliability of the witnesses against him." **Commonwealth v. Copeland**, 723 A.2d 1049, 1051 (Pa.Super. 1998) (citation omitted).

Pa.R.Crim.P. 573(E) provides for the following remedies:

> **(E) Remedy.** If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party

to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

Pa.R.Crim.P. 573(E) (bold in original)

It is well-settled that "[a] defendant seeking relief from a discovery violation must demonstrate prejudice....[He] must demonstrate how a more timely disclosure would have affected his trial strategy or how he was otherwise prejudiced by the alleged late disclosure." ***Commonwealth v. Causey***, 833 A.2d 165, 171 (Pa.Super. 2003).

In rejecting Appellant's ineffectiveness claim, the PCRA court concluded that, assuming the Commonwealth failed to provide the crime scene photographs to defense counsel prior to trial, Appellant failed to demonstrate he was prejudiced by trial counsel's failure to object. Specifically, the PCRA court indicated:

> As to [Appellant's] claim that counsel was ineffective for failing to object to the admission of crime scene photographs, which were not provided in discovery,[3] [Appellant] has not demonstrated prejudice from the discovery violation or the admission of the photographs.

> _____
> 3 It is unclear from the record whether the photographs were provided in discovery.
> _____

> If a discovery violation occurs, the court may grant a trial continuance or prohibit the introduction of the evidence or may enter an order it deems just under the circumstances. The trial court has broad discretion in choosing the appropriate remedy for a discovery violation. [The] scope of review is whether the court abused its discretion in not excluding evidence pursuant to Rule 573(E). A defendant seeking relief from a discovery violation must

- 12 -

demonstrate prejudice. A violation of discovery does not automatically entitle [an] appellant to a new trial. Rather, an appellant must demonstrate how a more timely disclosure would have affected his trial strategy or how he was otherwise prejudiced by the alleged late disclosure.

*Commonwealth v. Brown*, 200 A.3d 986, 993 (Pa.Super. 2018) (citations and quotations omitted).

\*\*\*

As [Appellant] does not demonstrate how a more timely disclosure of the photographs would have affected trial strategy, or otherwise prejudiced him, [he is not entitled to relief].

PCRA Court Opinion, filed 9/9/21, at 2-3.

We agree with the PCRA court's sound reasoning. Appellant did not indicate how a more timely disclosure of the crime scene photographs would have affected his trial strategy or how he was otherwise prejudiced by the alleged late disclosure. *See Causey*, *supra*. Further, Appellant has not demonstrated that there is a reasonable probability that, but for counsel's failure to object to the admission of the crime scene photographs, the outcome of the proceedings would have been different. *See Spotz*, *supra*.

Appellant suggests that, absent the crime scene photographs, there is no evidence that Appellant fired in the direction of the law enforcement officers and/or that he fired more than two shots. Appellant's Brief at 12. However, as we indicated on direct appeal, aside from the crime scene photographs, there was overwhelming evidence of Appellant's guilt in this regard.

For instance, the recording of Wife's call to 911 confirmed PCO Schau heard five gunshots at 1:24 a.m., and the CAD report generated by the

Pennsylvania State Police indicated the state troopers returned fire twenty seconds later at approximately 1:25 a.m. Trooper Callahan testified Appellant shot "multiple rounds…down the range towards us." N.T., (Jury Trial Day 2), 1/15/19, at 39.

Moreover, Corporal Wimer, who testified as an expert firearm and toolmark examiner, testified that eight of the nine discharged cartridge cases he found at the north end of the driveway in front of the pedestrian door were conclusively from Appellant's rifle. N.T., (Jury Trial Day 3), 1/16/19, at 34. Further, all of the officers at the scene testified they heard the distinctive "snap" of bullets fired towards them. N.T., (Jury Trial Day 2), 1/15/19, at 44, 71, 90-91, 103, 142, 163, 173-74. Also, Wife testified at trial that Appellant threatened that he would shoot anyone who came to the house. N.T., (Jury Trial Day 3), 1/16/19, at 102, 104.

Given this overwhelming evidence of Appellant's guilt, particularly that Appellant fired at the officers, as well as fired more than two shots, we conclude that Appellant has failed to demonstrate the necessary prejudice as required to prevail on an ineffective assistance of counsel claim. **See Spotz**, **supra** (holding that to demonstrate prejudice a petitioner must show there is a reasonable probability that the result of the proceedings would have been different but for counsel's deficient performance). Accordingly, Appellant is not entitled to relief on this basis.

Additionally, we note Appellant provides an alternate theory for finding trial counsel ineffective in failing to object to the admission of the crime scene photographs. Namely, he avers trial counsel should have objected since Corporal Weibel did not authenticate the photographs or follow proper crime scene protocol in photographing the forensic evidence.

To introduce a photograph at trial, the proponent must demonstrate that the photograph "is what it purports to be." *Commonwealth v. Koch*, 39 A.3d 996, 1002 (Pa.Super. 2011). A photograph may be authenticated where a witness who is "familiar with the items photographed" testified "that they are accurately depicted therein." *Commonwealth v. Wiltrout*, 457 A.2d 520, 523 (Pa.Super. 1983). *See* Pa.R.E. 901, Authenticating or Identifying Evidence, Comment ("Demonstrative evidence such as photographs, motion pictures, diagrams and models must be authenticated by evidence sufficient to support a finding that the demonstrative evidence fairly and accurately represents that which it purports to depict.").

Here, in rejecting Appellant's ineffectiveness claim, the PCRA court indicated the following:

> [Appellant] asserts counsel was ineffective in failing to object to the admission of the photographs as the photographs were not properly authenticated. However, [Appellant's] claim is belied by the record.
>
> ***
>
> As to the crime scene photographs, it was established at trial that Corporal Victoria Weibel took photographs of the crime scene:

> Q. All right, and we'll run through these. 11-B, and what—so we're clear, all of these photographs, you took 350 photographs; is that about right?
>
> A. That sounds about right.

N.T., (Jury Trial Day 2), [1/15/19], 191. Corporal Weibel also testified as to what the photographs depicted:

> Q. Okay, 11-S?
>
> A. Evidence tent number 8, that is a discarded rifle shell casing.
>
> Q. And 9?
>
> A. 9 is another discarded or discharged shell casing from a rifle.
>
> Q. Let's go to 11-T.
>
> A. Showing a small grouping of the next several tents.
>
>         ***
>
> Q. We're going to see the close ups now. But, 11-U, can you describe 11-U?
>
> A. This is, again, just another depiction of the evidence to the right of the discharged rifle casings which were over here (indicating), this was the evidence that was observed in front of the garage main door.

[*Id.*] at 195-96.

> Here, Corporal Weibel was present at the crime scene and took the photographs at issue. Thus, Corporal Weibel was familiar with the items photographed and she testified that the items were accurately depicted in the photographs. As such, the photographs were proper authenticated at trial.

PCRA Court Opinion, filed 9/9/21, at 3-4.

We agree with the PCRA court's sound reasoning. Here, Corporal Weibel, who took the crime scene photographs, testified at length as to what the photographs depicted. Thus, the photographs were properly authenticated by a witness, who was familiar with the items photographed and testified the

items were accurately depicted therein. ***See Wiltrout***, ***supra***; Pa.R.E. 901, Comment. Accordingly, there is no arguable merit to Appellant's underlying substantive claim. ***Benner***, ***supra***.

Appellant also suggests trial counsel was ineffective in failing to object to the introduction of the crime scene photographs since Corporal Weibel did not follow proper crime scene protocol in photographing the forensic evidence. In rejecting this claim, the PCRA court indicated:

> As to [Appellant's] claim that Corporal Weibel broke crime scene protocol in photographing the evidence, this claim is also belied by the record. [Corporal Weibel testified]:

> > Q. And what's the—generally, and we'll get to a whole boatload of photos, can you generally tell the jury, when you do this there must be a step-by-step checklist that you have, correct?

> > A. There is. Generally speaking, when I get there, I briefly touch base with troopers already on scene who may be in charge of the investigation and find out basic details of what they know to that point. Once I get briefed, I then begin to take overall pictures of the scene and that is to show how the scene looked when you get there, understanding that some things may have been slightly moved, the light may be slightly different. It's how it looks when I get there and begin my pictures. I take overalls, and then if I observed any evidence or possible evidence that might be related, I then take medium shots, as well as close-up photos. And again, all within the context of the general scene.

> N.T., (Jury Trial Day 2), [1/15/19], 185.

> > Q. Okay. And as you said, your photographs kind of start here and then start zooming, so we'll have 11-C. So, now you've done a closer shot as we're looking at 11-C correct?

> > A. Correct.

Q. So again, casing 1 and 2. We'll go to 11-D, and that's the now close up on one .45?

A. Yes.

[*Id.*] at 192. Thus, Corporal Weibel testified that she took pictures of the scene as well as close-ups of the evidence, in accordance with established protocol.

[Appellant] argues that Corporal Weibel should have placed a compass in the photographs to indicate that the discharged shell casings traveled from east to west. However, [Appellant] does not claim that Corporal Weibel was required pursuant to crime scene protocol to place a compass in the photographs. As the crime scene photographer, Corporal Weibel properly authenticated the photographs and nothing in her testimony demonstrated that any protocols were not properly followed when the scene was photographed.

PCRA Court Opinion, filed 9/9/21, at 4-5.

We agree with the PCRA court's sound reasoning. Here, there is no evidence that Corporal Weibel failed to follow proper crime scene protocol in photographing the scene. Appellant's bald suggestion that Corporal Weibel should have placed a compass next to the shell casings does not merit relief. Accordingly, we agree with the PCRA court that there is no arguable merit to Appellant's underlying substantive claim. **Benner**, **supra**.

In any event, as indicated *supra*, Appellant has failed to demonstrate the necessary prejudice as required to prevail on an ineffective assistance of counsel claim as it relates to his claims of authentication and failure to follow proper crime scene protocol. **See Spotz**, **supra**. That is, excluding the crime scene photographs, and considering the remaining overwhelming evidence of Appellant's guilt, Appellant has not demonstrated that, but for counsel's failure

- 18 -

to object to the introduction of the crime scene photographs, there is a reasonable probability that the result of the proceedings would have been different. *Id.* Accordingly, Appellant is not entitled to relief on his ineffective assistance of counsel claim on this basis, as well.[5]

In his next issue, Appellant contends trial counsel was ineffective in failing to hire an expert in firearms to testify at trial on behalf of Appellant. Specifically, Appellant contends:

> Counsel was also ineffective in that he failed to retain and employ a firearms expert for trial to testify and opine on the circumstances when a person would know that he was being shot at by a supersonic assault rifle. The [t]roopers all testified that they believed that they were being shot at by [Appellant] based on the snapping noises they heard. None of them were qualified or offered as an expert to testify as such. Counsel did not provide testimony of a firearms expert to refute these assertions even though this was contemplated by [Appellant].
>
> A firearms expert would have testified that the only way that you could know that you were being shot at is hearing a bang from the rifle in front of you and a flash from the muzzle of the gun. In any event, you would not hear snap noises, contrary to the testimony of the [t]roopers.
>
> ***
>
> A firearms expert did not testify on behalf of [Appellant] which would have addressed the sounds one would hear in

---

[5] We note that Appellant makes an undeveloped claim that trial counsel was allegedly ineffective in failing to object to the prosecutor's closing statement wherein the prosecutor referred to "snow tails" in support of the premise that Appellant was facing towards the state troopers when he fired at them. *See* Appellant's Brief at 13-14. Appellant's theory is that the prosecutor's statement was unsupported by the record since the crime scene photographs were not authenticated. *See id.* at 14. However, as discussed *supra*, we find no arguable merit to Appellant's claim that Corporal Weibel did not properly authenticate the crime scene photographs, and therefore, we decline to address this argument further.

concluding that he or she was being shot at. This would have contradicted the testimony of the [t]roopers in question on the snapping sounds they heard.

Appellant's Brief at 14-15, 31.

Our Supreme Court has held that:

> To satisfy the "arguable merit" prong for a claim of ineffectiveness based upon trial counsel's failure to call an expert witness, the petitioner must prove that an expert witness was willing and available to testify on the subject of the testimony at trial, counsel knew or should have known about the witness, and the defendant was prejudiced by the absence of the testimony. Prejudice in this respect requires the petitioner to "show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." **Commonwealth v. Sneed**, 616 Pa. 1, 45 A.3d 1096, 1109 (2012)[.] Therefore, the petitioner's burden is to show that testimony provided by the uncalled witnesses "would have been helpful to the defense." **Id.**

**Commonwealth v. Williams**, 636 Pa. 105, 141 A.3d 440, 460 (2016)

(citations, quotations, and footnote omitted).

Here, in rejecting Appellant's ineffectiveness claim, the PCRA court indicated the following:

> [Appellant] avers trial counsel was ineffective for failing to employ a firearms expert to testify and opine on the circumstances of when one would know that they were being shot at by a supersonic assault rifle. [Appellant] avers "[a] firearms expert would have testified that the only way one could know that they were being shot at is by hearing a bang from the rifle in front of them and seeing a flash from the muzzle of the gun. One would not hear snap noises, contrary to the testimony of the troopers." [Appellant] does not identify the alleged expert who would have offered such testimony nor does he demonstrate how the proposed testimony would have avoided prejudice to him.

PCRA Court Opinion, filed 9/9/21, 6 (citation to record omitted).

We agree with the PCRA court's sound reasoning. Appellant has not identified a firearms expert who would have offered the testimony proposed by Appellant. On this basis alone, his ineffectiveness claim fails for lack of arguable merit. **See Williams**, **supra**.

In any event, Appellant has failed to demonstrate the necessary prejudice. **Spotz**, **supra**. That is, absent the troopers' testimony regarding the "snapping" noises, which Appellant indicates trial counsel should have rebutted with an expert, there is overwhelming evidence that Appellant shot in the direction of the troopers.

For example, Trooper Callahan testified that, after he told Appellant to put down the gun, Appellant "turned toward [him] and squared up with [him]." N.T., (Jury Trial Day 2), 1/15/19, at 40. Trooper Callahan then stated, "[Appellant] instantly brought the gun up, swept over, and he said, f--- you, mother---, and multiple rounds came down the range towards us." *Id.* at 43. Trooper Callahan specifically testified he saw the barrel of Appellant's gun "come up." *Id.*

Moreover, Trooper Williams testified that Appellant squared his body "as if taking a shooting stance" and brought his gun up. *Id.* at 89. Trooper Goga testified he told Appellant to drop his weapon, and he observed Appellant "lift [his] rifle up in his right hand, his left hand came around, and gunfire was exchanged between the troopers and [Appellant]." *Id.* at 118, 142. Corporal Wimer confirmed that eight casings were found at the north end of the

driveway in front of the pedestrian door where Appellant was reported to be standing. N.T., (Jury Trial Day 3), 1/16/19, at 34-47. These eight casings came from Appellant's rifle. *Id.*

Accordingly, even if trial counsel had offered a firearms expert to rebut the troopers' testimony that they heard "snapping noises" and/or that such "snapping noises" would result from Appellant firing his rifle towards them, there is overwhelming evidence that Appellant shot in the direction of the officers. Thus, Appellant has not demonstrated that, but for counsel's failure to present a firearms expert, there is a reasonable probability that the outcome of the proceedings would have been different. *Spotz*, *supra*. Accordingly, Appellant is not entitled to relief on his ineffective assistance of counsel claim on this basis, as well.

In his next issue, Appellant contends the cumulative impact of the multiple instances of ineffective assistance of counsel deprived him of his due process rights.

Our Supreme Court has indicated:

We have often held that "no number of failed [ ] claims may collectively warrant relief if they fail to do so individually." However, we have clarified that this principle applies to claims that fail because of lack of merit or arguable merit. When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed. *Commonwealth v. Perry*, 537 Pa. 385, 644 A.2d 705, 709 (1994) (a new trial may be awarded due to cumulative prejudice accrued through multiple instances of trial counsel's ineffective representation).

***Commonwealth v. Spotz***, 610 Pa. 17, 18 A.3d 244, 321 (2011) (citations and quotations omitted).

Here, we have concluded that most of Appellant's ineffectiveness claims lack arguable merit, and accordingly, there is no basis for a claim of cumulative error with regard to these claims. ***See id.*** With regard to the single ineffectiveness claim that was denied based solely on a lack of prejudice, we are satisfied there is no cumulative prejudice warranting relief. ***Id.*** Thus, Appellant is not entitled to relief on this claim.

Finally, to the extent Appellant contends the PCRA court erred in dismissing his PCRA petition without holding an evidentiary hearing, we note:

> [T]he right to an evidentiary hearing on a post-conviction petition is not absolute. It is within the PCRA court's discretion to decline to hold a hearing if the petitioner's claim is patently frivolous and has no support either in the record or other evidence. It is the responsibility of the reviewing court on appeal to examine each issue raised in the PCRA petition in light of the record certified before it in order to determine if the PCRA court erred in its determination that there were no genuine issues of material fact in controversy and in denying relief without conducting an evidentiary hearing.

***Commonwealth v. Grayson***, 212 A.3d 1047, 1054 (Pa.Super. 2019) (quotation omitted).

Here, we conclude the PCRA court did not err in declining to hold an evidentiary hearing as Appellant's ineffectiveness claims are patently frivolous.

For all of the foregoing reasons, we affirm.

Affirmed.

- 23 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  8/31/2021